| 15 | 447 |
| 30 | 55 |
| 30 | 344 |
| 31 | 314 |
| 31 | 488 |

[No. 1624.]

HENRY ANDERSON *v.* THE STATE.

. 1. ASSAULT TO MURDER—MANSLAUGHTER—CHARGE OF THE COURT.—To reduce a killing from murder to manslaughter, it must have been superinduced by an adequate cause. When. therefore, in a prosecution for assault with intent to murder, there is no evidence tending to show that, had the death of the assaulted party resulted. such killing would have been manslaughter, there is no occasion for the court to charge upon the law of manslaughter.

2. MALICE—EVIDENCE.—Previous menaces are always legitimate evidence in determining the question of malice. See the opinion *in extenso* for evidence properly admitted under this rule. And note, also, evidence admissible as affecting the credibility of the testimony.

APPEAL from the District Court of Navarro. Tried below before the Hon. L. D. Bradley.

The indictment in this case charged the appellant with an assault with intent to murder one Ward Majors, on the fifteenth day of February, 1883.    Two years in the penitentiary was the punishment awarded by a verdict of guilty.

George Pruitt was the first witness who testified for the State. His narrative was to the effect that Henry Blandford, a negro man whom witness had employed to sow oats, employed the defendant to assist him.   Defendant came into the field on the morning of February 15, 1883, cursing and swearing that "no d—d white man could arrest" him.   Defendant persisted in the use of this character of language until finally the witness went to the opposite extreme of the field to avoid hearing him.   Defendant continued the use of foul language for some time, at the same time calling on Ward Majors, the assaulted party, to come into the field where he was.   This was in the morning.   Majors was then at the house of the witness's father, some little distance off, and was an employe of the witness's father.   When the witness went to the house to dinner, he called Ward Majors to assist him unharness his team.   At that time the witness saw the defendant coming towards the house from the direction of Edmund Blandford's, and heard some one call to him, but did not hear what was said.   Defendant came on up to the wagon, and started towards Ward Majors, saying that he was going to kill him.   He had an open knife in his hand as he advanced. Majors had out his knife, but witness made him put it up, and told him that he would protect him.   Defendant made at Majors the first time, and witness took the breast yoke of his wagon and made the defendant stop.   Witness then ordered the defendant to leave.   He refused, and kept cursing and trying to get at Ward Majors.   Witness, seeing that it would be difficult to protect him, if at all possible. told Ward Majors to run; which he did.   Defendant darted around the witness in pursuit, but witness got before him and stopped him a second time.   He then got by the witness and started in pursuit of Majors, who was running towards a fence some fifty yards distant.   Defendant followed with his knife. open in his hand.   He caught up with Majors just as the latter was getting over or through the fence, and struck at him with the knife.   The witness qualified this by saying that he was too far off to actually see the knife when this blow was struck.   Wallace caught the defendant and stopped him.

Defendant had his knife in his hand when he came up to the

wagon, and, in the opinion of the witness, would certainly have cut Majors, had the witness not prevented him with the breast yoke. The knife used by the defendant was an ordinary pocket knife, with a blade about four or five inches long, but was large enough to kill a man. Ward Majors, the defendant, Mr. Modisett and witness were the only parties at the wagon when the first attempt to cut Majors was made by the defendant. Sandy Wallace arrived between that time and the assault at the fence. This all occurred in Navarro county, Texas, on February 15, 1883.

Cross-examined, the witness stated that, in pronouncing the knife an ordinary pocket knife with a four or five inch blade, he gave only his estimate—he could not be exact. It may be possible that the blade of an ordinary pocket knife is but three inches long. The defendant came to the place of the difficulty from Edmund Blandford's house. The row occurred after all the field hands had quit work at noon, and had gone home to dinner. The witness was forty or fifty yards from the fence where defendant struck at Majors—too far for him to tell positively whether or not the defendant was near enough to reach Ward Majors; but they appeared to the witness to be right together, and within reach of each other. To the question: "Do you not feel very bitter toward the defendant for his abusive, profane and insulting language?" the witness answered: "I do not feel very kindly toward him; I feel about like you would." To the question: "Did not Ward Majors cut at the defendant at the fence?" the witness replied: "I never heard of Ward Majors trying to cut the defendant at the fence until now." Witness was a member of the grand jury that found this indictment. He has taken no great interest in securing the attendance of the witnesses in this case.

Ward Majors testified, for the State, that at the time of the assault he was in the employ of Mr. Sam. Pruitt, the father of the first witness. Defendant called to the witness during the morning to come into the field where he was plowing. Just before the difficulty, Mr. George Pruitt called the witness to go to the wagon where he was. Mr. Modisett was then unhitching the team. After the witness got to the wagon, the defendant came up and said that he was going to whip the witness. Witness told the defendant that he could not whip him. Defendant drew his knife and said that he would kill the witness. Mr. Pruitt caught up the breast yoke of the wagon and stopped the

defendant. Witness then started toward the fence, walking at first, but when he saw that defendant was following him he ran, and the defendant ran after him. Just as the witness was getting through the fence the defendant cut at him with his knife, but missed him. Sandy Wallace, who was at the fence, caught and stopped the defendant. The blade of the knife was about as long as a man's fore finger. When the defendant started after witness, witness ran, having then about thirty feet start. Witness was about half over the fence when Sandy Wallace caught the defendant. Mr. Pruitt was about a hundred yards distant from the fence. The witness had his knife out at the wagon, but put it up before the difficulty began. Defendant was not close enough to reach witness when he struck at him with the knife, but the witness could not say how near he was. Witness did not cut at defendant, nor did he have his knife out at the fence.

Ed. Modisett testified, for the State, that at the time of the difficulty he was in the employ of Mr. Pruitt. Just after dinner on that day witness was hitching his animals to his wagon, and Mr. George Pruitt called Ward Majors to assist him hitch up his wagon, and Ward came to the wagon. As soon as the defendant saw Majors, he, defendant, started towards the wagon, cursing and abusing Majors, and when he got to the wagon, struck at Majors. Pruitt caught up a breast yoke and told defendant to leave. Defendant refused to leave, when Majors went off, followed by the defendant. Pruitt started after defendant and followed him some forty or fifty yards. The defendant struck at Majors with his fist at the wagon. Witness did not know what occurred at the fence except that another negro named Sandy Wallace caught the defendant. If defendant had anything in his hand when he struck at Majors, witness did not see it. When Pruitt caught up the breast yoke he drew it on the defendant and told him to leave.

Cross-examined, the witness testified that Sandy Wallace caught the defendant just as Majors started to go through the fence. The witness's position at that time was about one hundred yards distant from the fence. Ward Majors had his knife out before the defendant came up, but Pruitt made him put it up. Witness did not see the defendant with a knife at any time during the difficulty. The defendant stood facing the witness, who stood at the head of the mule. Witness could see the defendant plainly from where he was. Mr. Pruitt was standing

with his back to Majors and the witness—rather between witness and defendant. Witness saw defendant strike at Majors at the fence, but could not see whether or not he had a knife. The two seemed very close together.

Edmund Blandford testified, for the State, that on the day of the difficulty he was sowing oats for Mr. Pruitt, and had the defendant employed to assist him. The difficulty began at the wagon in the field. Witness was near the defendant when the defendant started from the field to the wagon at the time that the difficulty occurred. Defendant said that he was going up to the wagon to whip some one, or to kill some one. Witness did not, of his own knowledge, know of any previous difficulty between the defendant and Ward Majors. The defendant was plowing in the field with the witness, and the wagon stood about one hundred and fifty yards off from the witness's house. Witness and defendant were about one hundred yards from witness's house when defendant said that he was going to the wagon to whip or kill some one. Witness tried to pursuade defendant not to go, but did not succeed. After the difficulty the defendant and Sandy Wallace, who were great friends, left together.

Cross-examined, the witness said that he was about fifty yards from the wagon, and was going in the opposite direction, when the defendant said that he was going to the wagon. Witness was sowing oats and defendant was plowing. Witness stopped sowing oats when defendant left, took the mule and plow, and went on with the plowing. Witness looked back but saw nothing. When he got to his house the distance was too great to see what was transpiring at the wagon. Witness tried to keep the defendant from going to the wagon, but could not.

Simon Melton testified, for the defense, that he was present and witnessed the quarrel between the defendant and Majors in the field, near the wagon, while Mr. Pruitt was sowing oats. Witness was then not more than twenty yards from the wagon, and saw and heard all that passed between the parties. As soon as Ward Majors came up to the wagon, the defendant started towards him and told him that he was going to whip him. Majors asked: "What for?" Defendant replied: "Because you struck me last night." Majors then said: "If you are going to do it, now is as good a time as any," and told him to "come on." Defendant ran up and struck at Majors with his fist. He had no knife in his hand. Mr. Pruitt, with a breast yoke drawn in

a striking attitude, stepped in between defendant and Majors. Pruitt told Majors to go home. Ward Majors started, got twenty or thirty steps off, when he turned and called the defendant a son of a b—h. The defendant thereupon started after him again. Majors ran and the defendant ran after him until they reached the fence. Majors got through the fence, and as the defendant was going through Majors cut the defendant in the arm with a knife. Defendant was not near enough to Majors to strike him when the latter went through the fence. Just as the defendant was getting through the fence Sandy Wallace caught him, and that ended the difficulty, and defendant and Wallace went up to Edmund Blandford's house.

Cross-examined, the witness testified that he was positive that the defendant had no knife when he struck at Majors at the wagon. Witness was within twenty yards of him at the time, and was looking at him. Witness had been plowing in the field all the morning with the others. He did not hear the defendant say in the field that he was going to whip or to kill any one, but did hear him tell Majors at the wagon that he was going to whip him. He did not hear Blandford tell defendant not to go to the wagon, nor did he see Blandford make any effort to prevent defendant going. Pruitt and Modisett were the only parties immediately at the wagon, besides defendant and Majors, when the difficulty occurred. John Gilbert, Sandy Wallace, defendant and witness were plowing in the field that morning, and Blandford was sowing oats.

Sandy Wallace testified, for the defense, that when Ward Majors started into the field he called to him and told him not to come—that defendant was angry and drinking, and if he came there would be a difficulty. Majors went to the wagon where Pruitt was, and defendant went to the wagon after him. Majors left, going a short distance, when he turned around, and the defendant started after him. Majors ran, defendant ran after him, and witness ran after both. Majors got through the fence, when he turned and cut the defendant in the arm with a knife, just as defendant was going through the fence. Witness saw that Majors had his knife out when he turned around. Witness caught the defendant as he was going through the fence, which terminated the difficulty. Witness then took defendant to the house. Defendant had no knife in his hand when he reached the fence, and had none when witness caught him. Defendant

was not close enough to reach Majors as Majors went through the fence.

On cross-examination, the prosecuting attorney asked the witness if he and defendant did not leave the country together that night. To this question the witness replied that defendant left Ed. Blandford's house that evening, and witness left that night. The two went together to Corsicana. Witness did not tell Ed. Blandford that he, witness, was going to help defendant all he could, and would help him pay his fine if he was fined. Witness did not, about three weeks before this trial, when told by Ed. Blandford that a subpœna was out for witness, say to said Blandford that, though summoned as a State's witness, he intended to do all he could for defendant. He did, however, on that occasion, tell Blandford that if defendant was fined he would help him pay his fine.

In rebuttal, the State called Ed. Blandford, who testified that Sandy Wallace did tell him that he was going to do all he could for the defendant.

Ed. Modisett testified, in rebuttal, that Simon Melton was not at the wagon when the difficulty occurred, but was off a distance of a hundred and fifty yards. Witness did not see Melton when the difficulty occurred, nor did he know where he was at that time. He did see him after it was over. He did not see Melton at any time nearer the wagon than a hundred yards.

Error in the charge of the court as given, the refusal of charges asked by defendant, and that the verdict was not supported by the evidence, were the grounds relied upon for a new trial, which was refused.

No brief for appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant was convicted of an assault to murder one Ward Majors. It is insisted that the court should have charged the jury the law of manslaughter, in order that they might have considered the case with reference to a finding for aggravated assault. Such charge is only required in cases where, if death had resulted from the assault, the offense would have been manslaughter instead of murder. To reduce a homicide from murder to manslaughter, an *adequate cause* must have superinduced it. We find nothing tend-

ing to show an adequate cause in the evidence before us, and the court did not err in declining to charge upon manslaughter.

Nor can we perceive that the objections interposed to the evidence set out in the two bills of exception are maintainable. As shown by the first bill, defendant came into the field that morning cursing and swearing, threatening *white men*, and his language was so threatening that the witness, who was a white man at his legitimate work in the field, "went to the other side of the field to avoid hearing what he said." The statement of facts shows that, whilst this occurrence was in the morning and some time before the assault, yet that in connection with this conduct the defendant was cursing Ward Majors, and calling him to come over in the field. Previous menaces are always legitimate evidence in determining the question of malice.

As to the second bill of exceptions, the evidence was legitimate, to show the relations between the witness Wallace and defendant, and the witness's actions and conduct in connection with defendant, in order that the jury might properly estimate the degree of credibility to be attached to his testimony.

We have been unable to find any error in this judgment of conviction, and it is therefore affirmed.

*Affirmed.*

Opinion delivered February 27, 1884.

